# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Tennessee

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  3:20-MJ- 1146 |
| JELONN MARQUISE TATE, a.k.a "Rocky," | ) | |
| DERRICK KELLEN MITCHELL, EUGENE JAMES MITCHELL, III., | ) | |
| a.k.a. "Pug," JOHN BELTON MITCHELL, a.k.a. "JB," RANDALL | ) | |
| SCOTT SMITH, and TAWANA CORTEZ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 1, 2019 through the present___ in the county of ___Knox___ in the ___Eastern___ District of ___Tennessee___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 846, 841(a)(1) and 841(b)(1)(A) | Conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine (actual). |

This criminal complaint is based on these facts:

Please see the Affidavit of FBI Task Force Officer Matthew Thompson which is attached hereto and fully incorporated herein.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI TFO Matthew Thompson
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/5/2020__

_____
*Judge's signature*

City and state: ___Knoxville, Tennessee___

Debra C. Poplin, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR CRIMINAL COMPLAINT

I, **FBI TFO Matthew Thompson,** being first duly sworn, hereby depose and state as follows:

1. I am presently conducting an investigation of **JELONN MARQUISE TATE, a.k.a "ROCKY" ("TATE"), EUGENE JAMES MITCHELL, III, a.k.a. "PUG" ("EUGENE MITCHELL"), DERRICK KELLEN MITCHELL ("DERRICK MITCHELL"), JOHN BELTON MITCHELL a.k.a. "JB" ("JOHN MITCHELL"), TAWANA DUNCAN CORTEZ ("CORTEZ"), RANDALL SCOTT SMITH a.k.a. "SCOTT SMITH" ("SMITH"),** and others, in connection with a large ice methamphetamine trafficking conspiracy operating in and around Knoxville, Tennessee, in violation of 21 U.S.C. §§ 841 and 846.[1]

2. I am a Task Force Agent with the FBI HIDTA Task Force in Morristown, Tennessee, and have been since August 2019. My primary responsibility is to conduct federal narcotics investigations in Tennessee. I have worked in the field of law enforcement for over twenty-four years. I am a Special Agent with the Tennessee Bureau of Investigation assigned to conduct narcotics investigations in Upper East Tennessee, having been so employed since September 2007. Prior to that, I worked for the Johnson City, Tennessee, Police Department (JCPD) for approximately twelve years. I conducted narcotics investigations on special assignment to the 1st Judicial District Drug Task Force (1st DTF) for seven of those twelve years with JCPD. I have received specialized training in drug investigations from the Tennessee Bureau of Investigation, as well as, attended a two-week Basic Narcotics Investigators School sponsored by the Drug Enforcement Administration (DEA), and at least thirty other specialized

---

[1] Some of these individuals sell other types of drugs as well, such as heroin and crack cocaine.

narcotics investigative schools sponsored by other state, local, and federal agencies. During my employment, I have been involved in, at least, 4,000 investigations involving the distribution of narcotics in Upper East Tennessee, which have been prosecuted in both State and Federal courts. I have testified as an expert witness on drug trafficking in Washington County Criminal Court in Jonesboro, Tennessee, and an opinion witness on drug trafficking in U.S. District Court in Knoxville, Tennessee. On, at least, 300 occasions I have acted in an undercover capacity to purchase narcotics from individuals trafficking in marijuana, cocaine, methamphetamine, heroin and other Controlled Substances in violation of the Drug Control Act of the State of Tennessee. I have executed search warrants, conducted wiretap intercept investigations and participated in numerous other wiretap investigations, conducted surveillance of drug transactions, seized evidence, arrested suspects, interviewed suspects, and conferred with prosecutors and other law enforcement officers regarding narcotics investigations in my community, and, as a result, have gained considerable experience.

     3.     Through experience and training, I have learned the following facts:

     A.     Individuals who deal in controlled substances and / or narcotics sometimes place assets derived from their criminal activities in names of other persons or corporate entities other than their own names. These dealers sometimes also use false names and identities in order to avoid detection of these assets by law enforcement agencies to avoid forfeiture of the same.

     B.     Individuals who deal in controlled substances and / or narcotics actually own and continue to use such assets derived from criminal activities and exercise dominion and control over this property, though it may be titled or recorded in the names of others.

C.    Individuals who deal in controlled substances and / or narcotics who purchase larger amounts of controlled substance must maintain and have access to large amounts of cash in order to maintain and finance their ongoing narcotics business.

D.    Individuals who deal in controlled substances often maintain some sort of records to keep up with their business activities, to include books, records, receipts, notes, ledgers, airline tickets, money orders, computer disk, tapes, papers, and/or other forms of information media, including smartphones, relating to the transportation, ordering, sale, and distribution of controlled substances.

E.    Individuals who deal in controlled substances will very often hide contraband, proceeds of drug sales, large amounts of currency, financial records, precious metals, jewelry, and/or records of drug transactions in one or more of the following locations in order to conceal them from law enforcement officials:

- Secure locations such as their own residences;

- Residences or businesses of other co-conspirators;

- Their business;

- Banks or safety deposit boxes;

- Storage units.

F.    When dealers in controlled substances amass large sums of money from the sale of drugs and other related criminal activities, they sometimes will attempt to legitimize these illegal profits so as to avoid suspicion from law enforcement officials, seizure and forfeiture of such wealth, and to further avoid federal tax liabilities.  These dealers sometimes then "launder"

their ill-gotten gains through various schemes, including use of the banking system, the purchase of cashier's checks, wire transfers of funds, bank money drafts, letters of credit, purchase of stocks, bonds and mutual funds, the purchase of automobiles, real estate investments, false reporting of the actual purchase prices of property, the structuring of financial transactions to avoid federal currency reporting requirements, the establishment of phony or "shell" corporations, and/or the establishment of business "fronts" which presents an easy method of claiming that ones wealth, actually gained from criminal enterprises, derived from a legitimate source.

G.     Unexplained wealth is relevant and probative evidence of drug trafficking.

H.     Persons who deal in controlled substances commonly maintain addresses and telephone numbers in books, papers, electronic devices or other forms of information media, to include smartphones, which reflect names (or nicknames or aliases), addresses. and telephone numbers of their associates or customers in the drug trafficking organizations.

I.     Individuals who deal in controlled substances sometimes possess photographs and/or videotapes of themselves, their criminal associates, their drugs, their weapons, and their property which are proceeds of illegal activities.  They may also possess photographs and / or videotapes of themselves and their associates involved in activities that require the expenditure of large amounts of money that they have acquired through illegal activities.

J.     Dealers in controlled substances commonly possess, actually or constructively, firearms, ammunition, and other types of weapons. These weapons are used to protect and secure their property, drugs and illegal profits from thieves in drug dealers are always at risk of being ripped off by other drug dealers and/or drug customers.  Those rip-offs may occur during a drug

transaction, during a home invasions robbery, or during a burglary. Also, because firearms are in demand by drug dealers, such items are often bartered for drugs. As such, firearms are considered tools of the drug trade.

K.    Dealers in controlled substances commonly have in their possession cellular telephones, most commonly smartphones, that they use to communicate with others involved in the sale, purchase, and distribution of controlled substances. A number of these devices are designed to record or store numerical or alpha-numerical data and audible messages from individuals who may contact or attempt to contact the device. Further, these devices may record numbers which have been recently keyed, or which are most frequently keyed into the telephone. These devices also may contain stored photographs and/or videos related to drug trafficking. These types of information constitute evidence of their drug trafficking activities.

L.    Dealers in controlled substances commonly "front" or loan drugs on consignment to some of their customers who must pay for their drugs from the proceeds of their resales. As a result, the drug dealers must keep records of transactions where they can have a quick and reliable means to recall the status of such transactions. Very often, these records will be maintained at the residence or business used by the drug dealer or one of his / her accomplices.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and, therefore, does not attempt to set forth all of my knowledge about this matter.

5.    On or about July 25, 2019, the FBI HIDTA Task Force began conducting an investigation into the ice methamphetamine trafficking activities of DILLON BEELER in

Grainger County, Tennessee. Agents have seized 78 grams of ice methamphetamine from BEELER to date, through controlled purchases and searches. This investigation lead to the identification of ANGELINE GIDEON as one of DILLON BEELER's sources of supply. Agents have seized approximately 46 grams of ice methamphetamine from ANGELINE GIDEON to date, through controlled purchases and searches.

6.      On or about January 10, 2020, agents conducted an interview of an individual, who later agreed to cooperate in this investigation, hereafter referred to as CS-11559. CS-11559 was arrested on January 9, 2020, in Union County, Tennessee for possession of ice methamphetamine. During the course of the interview, CS-11559 admitted to being ANGELINE GIDEON's source of supply. CS-11559 stated that unidentified black males "PUG" and "ROCKY" were his/her ice methamphetamine suppliers. CS-11559 began purchasing ice methamphetamine from "PUG" in July 2019. CS-11559 initially began purchasing half-ounce quantities of ice methamphetamine from "PUG" for approximately one month (on approximately ten occasions), and then progressed to purchasing one-ounce quantities of ice methamphetamine (on approximately four to five occasions). In November 2019, CS-11559 traveled to "PUG's" residence and attempted to make contact with him, to make a methamphetamine (ice) purchase. CS-11559 was approached by an unidentified black male known only as "ROCKY" in the driveway of "PUG's" residence. "ROCKY" explained that "PUG" was asleep and there was no reason to wake him, but offered to sell CS-11559 ice methamphetamine himself. CS-11559 purchased an ounce of ice methamphetamine on this occasion from "ROCKY" and started purchasing from "ROCKY" exclusively from this point forward.

7.      Since November 2019, CS-11559 has purchased ice methamphetamine from "ROCKY" on almost a daily basis. CS-11559 purchased one-ounce quantities of ice

methamphetamine from "ROCKY" approximately six or seven occasions and then progressed to purchasing 2 ½ to 3 ounces at a time. This continued for approximately one month on a daily basis. In December 2019, CS-11559 began purchasing quarter-pound quantities (4 ounces) at a time from "ROCKY" on a daily basis for $1,500, and this continued until January 8, 2020. CS-11559 identified TATE as "ROCKY" and EUGENE MITCHELL as "PUG" from photographs.

8.      Between January 10, 2020 and February 7, 2020, agents utilized CS-11559 to conduct approximately seven controlled purchases of ice methamphetamine from TATE, ranging from approximately four ounces (1/4 pound) to approximately two ounces in weight. Agents have seized approximately 669 grams of ice methamphetamine from TATE to date, through controlled purchases, all within the Eastern District of Tennessee. (A typical dosage unit of ice methamphetamine is one to two-tenths of a gram). All the transactions have been monitored live via audio/video feed and were video recorded.[2] Five of the transactions with TATE occurred at or near 4017 Oakland Drive, Knoxville, Tennessee, either in the driveway or the roadway in front of the residence.

9.      CS-11559 has provided truthful information regarding other co-conspirators involved in this investigation, which has been independently verified by other reliable confidential sources. Additionally, CS-11559's information in this investigation proved to be accurate by virtue of seven controlled purchases, resulting in the seizure of approximately 669 grams of ice methamphetamine from TATE. CS-11559 currently has multiple outstanding drug charges in Union County, Tennessee, for which CS-11559 seeks leniency. Additionally, agents have paid CS-11559 to help cover some of his/her cooperation-related expenses. CS-11559's criminal history includes multiple theft of property offenses, multiple burglary offenses, multiple

---

[2] I have reviewed all of the buy recordings in this case and all are consistent with the reporting by the confidential sources.

robbery offenses, forgery, and vandalism. However, extra control measures where utilized with CS-11559, including using live audio/video feeds to confirm the veracity of CS-11559's statements and reports.

10.    On or about January 28, 2020, agents installed a covert camera system with two cameras (the "covert camera system" or "camera system") near 4017 Oakland Drive Knoxville, Tennessee ("Oakland Drive"). EUGENE MITCHELL and JOHN MITCHELL live or routinely stay at Oakland Drive. TATE, EUGENE MITCHELL and JOHN MITCHELL routinely sell narcotics (mostly "ice" methamphetamine) from the driveway or roadway frontage of Oakland Drive. On February 28, 2020, April 13, 2020, May 27, 2020, July 10, 2020 and August 24, 2020, search warrants for continued monitoring of the covert camera system located at Oakland Drive were authorized by this Court. This camera system is currently active.

11.    On February 20, 2020, a search warrant authorizing the collection of real-time geolocation information and other information for AT&T cellular telephone number (865) 332-8653 ("TARGET PHONE #1") utilized by TATE during the above mention transactions was issued by this Court. On April 13, 2020, May 27, 2020, July 10, 2020 and August 24, 2020, search warrants for continued monitoring real-time geolocation information were authorized by this Court. Collection of real-time geolocation information is currently ongoing.

12.    On June 16, 2020, agents interviewed TBI confidential source CS-11632. CS-11632 provided the following information regarding EUGENE MITCHELL, JOHN MITCHELL and TATE. CS-11632 first met EUGENE MITCHELL and JOHN MITCHELL approximately twenty years ago and has been purchasing crack cocaine from both of them, off and on, over the years. CS-11632 stated that for the past two to three years, JOHN MITCHELL and EUGENE MITCHELL have been supplied crack cocaine by their nephew, "Jelonn." Over the past three

years, CS-11632 has been purchasing user amounts of heroin from "Jelonn," and that "Jelonn" also sells methamphetamine but believes that there has been a shortage of methamphetamine recently. CS-11632 said that "Jelonn" has mentioned that he carries a gun and would refer to being armed with a gun as being "strapped." CS-11632 stated that "Jelonn" generally drives rental vehicles and recently saw him in one such vehicle. CS-11632 provided telephone number TARGET PHONE # 1 as the telephone number "Jelonn" utilizes to distribute narcotics. Since this interview, CS-11632 has identified "Jelonn" as TATE.

13. On June 16, 2020, while agents were conducting physical and video surveillance at Oakland Drive, agents observed a newer model, blue, Chevrolet, four-door sedan stop at Oakland Drive for approximately four minutes and then leave the area. The surveillance team was unable to obtain a tag number, but the tag looked like it was from out-of-state. Later that evening, CS-11632 reported that, on June 14, 2020, he/she saw TATE in a rented newer model, blue, Chevrolet, four-door sedan. On June 22, 2020, a surveillance team member was conducting surveillance in the area of Lovell Road and Brookmill Road attempting to locate TATE. Based on the video surveillance footage from Oakland Drive, geolocation data from TARGET PHONE # 1, and the information by CS-11632, the surveillance team member located a vehicle matching the description at Meadowview Way. The car was a Hertz rental and displayed Virginia license plate UTT-7642.

14. Beginning on June 17, 2020, CS-11632 began making controlled purchases of ice methamphetamine from JOHN MITCHELL and EUGENE MITCHELL. CS-11632 has provided truthful information regarding other co-conspirators involved in this investigation, which has been independently verified by other reliable confidential sources. Additionally, CS-11632's information in this investigation proved to be accurate by virtue of approximately eleven

controlled purchases, resulting in the seizure of approximately 202 grams of ice methamphetamine. CS-11632 currently has outstanding drug charges in Knox County, Tennessee, for which CS-11632 seeks leniency. These charges stem from a traffic stop leaving Oakland Drive, where CS-11632 was found to be in possession of approximately 1 gram of ice methamphetamine. Additionally, agents have paid CS-11632 to help cover some of his/her cooperation-related expenses. CS-11632's criminal history includes DUI, multiple drug paraphernalia, multiple drug offenses, vehicular assault, theft of property offenses and vandalism. However, extra control measures where utilized with CS-11632, including using live audio/video feeds to confirm the veracity of CS-11632's statements and reports.

15.    Between June 17, 2020 and the current date, CS-11632 has purchased approximately 94 grams of ice methamphetamine from EUGENE MITCHELL over six transactions and approximately 108 grams of ice methamphetamine from JOHN MITCHELL over five transactions. Many of the transactions originated at Oakland Drive and terminate at Oakland Drive. During the course of several of the transactions, with both EUGENE MITCHELL and JOHN MITCHELL, they have taken ice methamphetamine into Oakland Drive to be separated and/or weighed. Several of the transaction will be described in greater detail in the following paragraphs.

16.    On June 22, 2020, agents caused a covert camera system to be installed near 1906 Meadowview Way in Knoxville ("Meadowview Way"). This location is TATE's current residence and the location where he most likely stores his drugs, drug money, and drug-related business records. Lenoir City Utility Board (LCUB) records indicate that "Jeanesha Chandler" turned on power at the residence on May 4, 2020 and has no other active power service in the LCUB or KUB coverage area. JEANESHA CHANDLER is TATE'S current girlfriend. On July

10, 2020 and August 24, 2020, search warrants for continued monitoring of the covert camera system located at Meadowview Way were authorized by this Court. This camera system is currently active.

17.     On July 2, 2020, agents utilized CS-11632 to make a controlled purchase of ice methamphetamine from EUGENE MITCHELL.   CS-11632's entered EUGENE MITCHELL's vehicle and they traveled to 2020 Flagler Road, Knoxville, Tennessee (the residence of DERRICK MITCHELL's girlfriend, AMBER ALEXIS FREEMAN).  Upon arrival, EUGENE MITCHELL remained in the vehicle on the telephone.  DERRICK MITCHELL approached the driver-side door of the vehicle and began talking to CS-11632 and EUGENE MITCHELL. EUGENE MITCHELL discussed the transaction with DERRICK MITCHELL and they determined that DERRICK MITCHELL did not have enough with him to fill the order. DERRICK MITCHELL walked away from the vehicle and CS-11632 and EUGENE MITCHELL got into an argument about DERRICK MITCHELL not having the methamphetamine. A short time later, DERRICK MITCHELL returned to the vehicle and asked CS-11632 if he/she still wanted the methamphetamine. CS-11632 agreed to continue with the transaction. Later that night, CS-11632 and EUGENE MITCHELL returned to 2020 Flagler Road, Knoxville, Tennessee.  As they pulled into the driveway of the residence, CS-11632 paid EUGENE MITCHELL $450 in TBI confidential funds.  EUGENE MITCHELL called DERRICK MITCHELL and said, "You want me to come in the house?"  DERRICK MITCHELL replied, "I'm gonna come out there."  EUGENE MITCHELL said, "Okay.  I'm gonna need that buck fifty for my way and I got that for the half."  DERRICK MITCHELL replied, "All right."  EUGENE MITCHELL exited the vehicle and met with DERRICK MITCHELL at a white compact vehicle in the driveway.  EUGENE MITCHELL entered the

passenger-side front seat and DERRICK MITCHELL entered the driver's seat. A short time later, EUGENE MITCHELL returned to the vehicle and got into the vehicle with CS-11632. EUGENE MITCHELL provided CS-11632 with approximately 14 grams of suspected ice methamphetamine as they were leaving the area. CS-11632 reported that EUGENE MITCHELL conducted at least seven crack cocaine transactions while they were in the vehicle together waiting for DERRICK MITCHELL to retrieve the methamphetamine. This transaction was monitored via audio/video live feed and was video recorded, and I have reviewed the recording.

      18.     On July 24, 2020, agents interviewed JOSHUA ADAM DOUGLAS ("DOUGLAS"). DOUGLAS voluntarily agreed to be interviewed out of concern for his girlfriend, LEAH TAYLOR. TAYLOR was missing at the time and DOUGLAS believed that members of the Outlaw Motorcycle Gang and the Aryan Brotherhood had taken TAYLOR for sex trafficking purposes, as they had done in the past. DOUGLAS believed that the gangs kept TAYLOR high on drugs to prevent her from leaving. Since then, I have spoken to TAYLOR on the phone and tried to get her to come in for an interview. She initially agreed and then failed to show up for the interview and failed to reschedule despite my attempts to do so. No benefits have been extended or promised to DOUGLAS in exchange for being interviewed. His relationship with CORTEZ and other DTO participants has been damaged because he confronted them about their sex trafficking of TAYLOR. Thus, DOUGLAS is not in a position to make controlled purchases and active cooperation is not being contemplated, at least at this time. DOUGLAS was informed that his information would be passed along to the U.S. Attorney's Office. I am unaware of previous efforts by DOUGLAS to cooperate with law enforcement, so I cannot provide any information about his past propensity for truthfulness. DOUGLAS has convictions for theft, burglary, and drug charges, and he admitted to me to being a thief. Based

on the foregoing facts and circumstances, I consider DOUGLAS's information (detailed in the following subparagraphs) to have been voluntarily given, and I believe it to be reliable because it is highly detailed and consistent with other information known to me based on my investigation of this DTO.

19.     In mid-June 2019, DOUGLAS moved into 7705 Tillett Lane, Corryton, Tennessee ("Tillett Lane"), the residence of CORTEZ. CORTEZ has supplied methamphetamine to DOUGLAS in the past in exchange for stolen goods. CORTEZ claims to be a former police officer from St. Petersburg, Florida. Tillett Lane has numerous security cameras and CORTEZ monitors remotely from her cellular phone. CORTEZ keeps a firearm in the master bedroom and has a safe in Tillett Lane for which DOUGLAS knows the combination.

20.     CORTEZ receives large amounts of stolen merchandise from customers in exchange for methamphetamine. CORTEZ stores the stolen merchandise inside Tillett Lane. CORTEZ trusted DOUGLAS because he never stole from her. CORTEZ started asking DOUGLAS to guard or watch Tillett Lane while she was away on methamphetamine resupply trips. Over time, DOUGLAS became an "enforcer" or "security" for Tillett Lane while CORTEZ dealt methamphetamine to customers there.

21.     CORTEZ typically sells approximately 40 ounces of methamphetamine per week out of Tillett Lane. Initially, CORTEZ started taking DOUGLAS's girlfriend, TAYLOR, on methamphetamine resupply trips every one to two weeks. CORTEZ and TAYLOR would leave Tillett Lane together and return with gallon-size plastic baggies of methamphetamine. Sometimes the methamphetamine would be clear and sometimes it would be pink. TAYLOR and CORTEZ continued obtaining Methamphetamine together for approximately two to two-

and-a-half months before TAYLOR was incarcerated. Thereafter, CORTEZ asked DOUGLAS to start going with her.

22. In August 2019, CORTEZ took DOUGLAS to an address on Oakland Drive in Knoxville, Tennessee, where CORTEZ met with PUG, whom DOUGLAS identified as EUGENE MITCHELL from an unmarked photograph. CORTEZ gave PUG over $3,000 cash, and PUG met with a black male called "Onion" in a black Mercedes. PUG took the money to Onion, retrieved approximately 14 ounces of methamphetamine from Onion, and then provided it to CORTEZ.

23. As noted, DOUGLAS identified PUG as EUGENE MITCHELL from an unmarked photograph. DOUGLAS also positively identified JOHN MITCHELL as someone known to him as "JB" from an unmarked photograph. DOUGLAS also positively identified an unmarked photograph of Oakland Drive as the residence of JOHN MITCHELL (known to him as "JB") and EUGENE MITCHELL (known to him as "PUG"). DOUGLAS said that CORTEZ primarily dealt with PUG (EUGENE MITCHELL), but he was aware that JB (JOHN MITCHELL) also sells methamphetamine.

24. Over the next two to three months, DOUGLAS continued to go with CORTEZ Oakland Drive on a regular basis to purchase methamphetamine supplies. During this period, CORTEZ also started taking a white female named "Dawn Marie" on resupply trips. CORTEZ was purchasing a quarter-pound or more of methamphetamine every other week during this time. Sometimes, DOUGLAS would not go on those runs. But even when he did not go, he would still see amount of methamphetamine when they returned to Tillett Lane. Agents showed DOUGLAS a photograph with no identifiers of DAWN MARIE BILLADO, and DOUGLAS identified her as "Dawn Marie."

25.    DOUGLAS admitted that he was considered an enforcer and protector of Tillett Lane and that his primary role in the organization was to make sure that CORTEZ was not robbed, that order was maintained at Tillett Lane, and that people were not stealing CORTEZ's property.

26.    In October 2019, someone named Roy Hurst wrecked CORTEZ's vehicle. The loss of the vehicle caused CORTEZ to have financial difficulty, and she progressively started purchasing smaller amounts of methamphetamine. From this time forward, CORTEZ was purchasing approximately one to two ounces of methamphetamine at a time, a couple times a week.

27.    On January 29, 2020, CODY SEALS was arrested after a shootout with the Tennessee Highway Patrol in Chattanooga, Tennessee. THP seized approximately 1.5 kilograms of methamphetamine and approximately 500 grams of heroin from SEALS that was to be delivered to CORTEZ and SCOTT SMITH. They were to split the shipment equally.

28.    In mid-March 2020, DOUGLAS specifically remembered another occasion when he went with CORTEZ to Oakland Drive and she purchased approximately a quarter-pound of methamphetamine from PUG (EUGENE MITCHELL).

29.    The COVID-19 pandemic has had a huge impact on methamphetamine prices in Knoxville, resulting in CORTEZ getting less methamphetamine for her money. CORTEZ has a new methamphetamine supplier named TRAVIS MCCOY. DOUGLAS described MCCOY as a white male in his 30s, claiming to be from Detroit, Michigan. MCCOY has a black Chevy Silverado pickup truck and a blue BMW SUV. Less than a month ago, he accompanied CORTEZ to a residence on Dutch Valley Drive in Knoxville to meet with MCCOY. MCCOY insisted that CORTEZ and DOUGLAS enter the residence, even though DOUGLAS wanted to

remain in the car. CORTEZ purchased approximately a quarter-pound of methamphetamine and an eighth-ounce of black tar heroin from MCCOY inside the residence. DOUGLAS said that, while he was in the residence, he observed approximately five pounds of methamphetamine and approximately five pounds of black tar Heroin. DOUGLAS said that the residence appeared to be a stash house because it was furnished with only an air mattress and a single folding chair. Based on DOUGLAS's information, agents were able find a 2001 BMW BX5 SUV registered to TRAVIS MCCOY at 1904 Dutch Valley Drive, Apartment 18, Knoxville, Tennessee. DOUGLAS identified an aerial photograph of that location and indicated that it was the last building at the end of a dead-end in Dutch Valley Village Apartments. DOUGLAS positively identified an unmarked photograph of TRAVIS CHEYENNE MCCOY as the TRAVIS MCCOY he had met.

30. More recently, CORTEZ instructed DOUGLAS and DAWN MARIE BILLADO to meet a methamphetamine supplier at the Dollar General Store on Dutch Valley Road in Knoxville to pick up methamphetamine for her. DOUGLAS and BILLADO met the unknown supplier and purchased the methamphetamine on behalf of CORTEZ. However, BILLADO handled the transaction and he does not know how much methamphetamine BILLADO purchased on CORTEZ's behalf.

31. On or about July 18, 2020 (the Saturday prior to the interview), CORTEZ obtained approximately a quarter-pound of methamphetamine and sold all of it by the end of the day.

32. CORTEZ's current boyfriend is Allen Ellison. Agents provided DOUGLAS with an unmarked photograph of ALLEN SHANE ELLISON and DOUGLAS identified the photograph as CORTEZ's current boyfriend. CORTEZ's DTO is associated with the Outlaw

Motorcycle Gang and the Aryan Brotherhood. CORTEZ's DTO is associated with an address on Whirlwind Way, Mascot, Tennessee, through LAURA JAMES BAKER. DOUGLAS said that BAKER lives at the Whirlwind Way address in a doublewide trailer, and the property belongs to the Outlaw Motorcycle Gang. "Drew Buckner" is the local leader of the Outlaw Motorcycle Gang and visits CORTEZ at Tillett Lane on a regular basis. Drew Buckner is one of CORTEZ's largest methamphetamine customers. DOUGLAS positively identified ANDREW LESTER BUCKNER as this person from an unmarked photograph. Other Outlaws and/or Aryan Brotherhood members who frequently visit Tillett Lane and are associated with CORTEZ's DTO include men known to him as "PeeWee," "Jawbone," and "Boone."

33.     As noted, ANDREW BUCKNER is CORTEZ's largest methamphetamine customer. Other regular customers include James Steiner, Mark Steiner, Jessica Williams (who lives at or near 8909 Emory Road, Knoxville, Tennessee), and Scott Smith **(SMITH)** (who lives in front of a church on Corryton Road in Knoxville), Michael Tolliver, and someone called "Nurse Bob" who drives a newer-model, 4-door, Nissan Frontier pickup truck.

34.     On July 27, 2020, a surveillance team conducted physical surveillance at Meadowview Way, the residence of TATE and his girlfriend, JEANESHA CHANDLER ("CHANDLER"). During the course of the surveillance, TATE exited the residence and entered a 2020 Chevrolet Sonic sedan displaying Wisconsin tag #AHM-9556, registered to Hertz Vehicles LLC, 501 West Edgerton Avenue Milwaukee, Wisconsin. Records from Hertz Corporation indicate that this vehicle was rented by CHANDLER on June 12, 2020 in Knoxville, Tennessee. TATE sat in the vehicle for an extended period of time, exited the vehicle and began searching the vehicle. TATE began searching a black backpack that he retrieved from inside the vehicle. TATE appeared nervous and was looking around the neighborhood while searching the

backpack. TATE appeared to put the backpack in the rear seat and then lay across the front seats upside down searching the floorboards.

35.     After an extensive search, TATE left the residence and the surveillance team followed him to 3143 Johnston Street, Knoxville, Tennessee. TATE pulled under a shade tree where it was difficult to see him. A couple minutes later, someone exited the residence and approached TATE's vehicle. The subject met with TATE for approximately one minute and then returned to the residence.

36.     TATE left the residence and the surveillance team followed him to Oakland Drive. TATE drove Oakland Drive and then turned on Acorn Street, circled around to Cabin Street, and then drove back by Oakland Drive. The surveillance team noted that TATE seemed to be conducting counter surveillance.

37.     TATE then traveled to 3511 Greenway Drive, Knoxville, Tennessee. A grey Jeep Cherokee with a red tailgate pulled in behind TATE at the residence. TATE pulled under a shade tree and visibility was somewhat obstructed for the surveillance aircraft. A surveillance team member drove by the residence approximately one minute later and observed a white male from the Jeep Cherokee approaching TATE'S vehicle in the driveway.

38.     A short time later, TATE left the residence undetected due to obstruction by tree cover. With the aid of court-authorized geolocation information for TARGET PHONE # 1, surveillance team members determined that TATE's phone was located off Western Avenue near RR Buildings. The surveillance aircraft located TATE's vehicle behind RR Buildings at A+ Auto Services. Due to cloud cover, the surveillance aircraft had difficulty monitoring TATE in the parking lot. TATE remained at A+ Auto Services for approximately 30 minutes and then left the business.

39.     The surveillance team continued to follow TATE to the 9100 block of Parktop Lane Knoxville, Tennessee, where TATE pulled into the apartment complex and backed into a parking space approximately 100 yards or less from the roadway.  A short time later, a surveillance team member drove by the apartment complex and TATE's vehicle was gone.  With the aid of court-authorized geolocation information for TARGET PHONE # 1, agents were able to determine that TATE had traveled to east Knoxville but were unable to re-establish contact with TATE.

40.     Based upon my training, knowledge, and experience, I believe that TATE likely misplaced narcotics and/or US currency and was searching his vehicle and backpack for the lost items.  Furthermore, Meadowview Way is TATE's primary residence where TATE most likely stores narcotics and proceeds of narcotics trafficking.  TATE's stops at the residences were consistent with his known drug trafficking activities.  The fact that TATE was able to conduct multiple apparent narcotics transactions without stopping at an alternate storage location further suggests that Meadowview Way is his stash location.  The grey Jeep Cherokee with the red tailgate described above has been seen at Oakland Drive on numerous occasions in a manner consistent with drug trafficking.

41.     On July 28, 2020, agents utilized CS-11632 to make a controlled purchase of ice methamphetamine from JOHN MITCHELL at Oakland Drive.   JOHN MITCHELL entered CS-11632's vehicle and CS-11632 provided JOHN MITCHELL with $750 in TBI confidential funds.  CS-11632 and JOHN MITCHELL traveled to 2020 Flagler Road, Knoxville, Tennessee (the residence of DERRICK MITCHELL's girlfriend, AMBER ALEXIS FREEMAN).  Upon arrival, JOHN MITCHELL exited the vehicle with the TBI confidential funds and entered the residence.  A short time later, JOHN MITCHELL and DERRICK MITCHELL exited the

residence together and walked out into the driveway. JOHN MITCHELL entered CS-11632's vehicle and retrieved two plastic baggies of suspected methamphetamine from his pockets. JOHN MITCHELL mixed the two plastic baggies of suspected methamphetamine together into one baggy. CS-11632 and JOHN MITCHELL left the residence and returned to Oakland Drive. While traveling, JOHN MITCHELL gave the suspected methamphetamine to CS-11632. Upon arrival at Oakland Drive, CS-11632 entered the residence and met with JOHN MITCHELL in his bedroom. CS-11632 weighed the plastic baggy of suspected methamphetamine and confirmed that it was one ounce. During the course of this transaction, JOHN MITCHELL received a telephone call from a female named "Tawana" who wanted to purchase one-and-a-half ounces of methamphetamine. I believe this to have been CORTEZ. JOHN MITCHELL instructed CORTEZ to come to Oakland Drive in about thirty minutes. Part of the conversation was on speakerphone and some was not. CS-11632 overheard the conversation while sitting beside JOHN MITCHELL in the vehicle. This transaction was monitored via audio/video live feed and was video recorded, and I have reviewed the recording. The recording corroborates CS-11632's version of events.

42.     After the transaction, CS-11632 identified a photograph of CORTEZ as the person on the phone known to him/her as "Tawana." After completing the transaction, a surveillance team responded to Tillett Lane, CORTEZ's residence, and set up surveillance. CORTEZ left the residence several times but did not travel to Oakland Drive. It is unknown whether the anticipated transaction between JOHN MITCHELL and CORTEZ occurred later that night or not at all.

43.     On July 30, 2020, agents utilized CS-11632 to make a controlled purchase of ice methamphetamine from EUGENE MITCHELL. Later that day, CS-11632 met with EUGENE

MITCHELL at Oakland Drive. EUGENE MITCHELL entered the vehicle and they traveled to Tewksbury Drive, the residence of DERRICK MITCHELL. While traveling, CS-11632 provided EUGENE MITCHELL $750 in TBI confidential funds. Upon arrival at Tewksbury Drive, CS-11632 observed DERRICK MITCHELL look out the window. EUGENE MITCHELL exited the vehicle with the TBI confidential funds and entered the residence. A short time later, EUGENE MITCHELL returned to the vehicle with approximately one-half-ounce of suspected methamphetamine in a zip-lock baggy. EUGENE MITCHELL then retrieved another half-ounce of suspected methamphetamine that he had previously stashed in CS-11632's dash. EUGENE MITCHELL mixed the two bags together and provided approximately one ounce of suspected methamphetamine to CS-11632. During the course of the transaction, CS-11632 and EUGENE MITCHELL discussed how TATE had sold JOHN MITCHELL an ounce of methamphetamine that was not good or was fake. EUGENE MITCHELL indicated that JOHN MITCHELL was upset with TATE and that TATE owed JOHN MITCHELL $1,000. This transaction was monitored via audio/video live feed and was audio/video recorded, and I have reviewed the recording. As noted above, EUGENE MITCHELL had approximately ½ ounce of methamphetamine on him when CS-11632 picked him up from Oakland Drive and combined with ½ ounce obtained from DERRICK MITCHELL to complete the transaction, demonstrating that EUGENE MITCHELL stores methamphetamine at Oakland Drive.

44.     On August 7, 2020, agents caused a covert camera system to be installed at or near 6436 Tewksbury Drive, Knoxville, Tennessee ("Tewksbury Drive"), the current residence of DERRICK MITCHELL. DERRICK MITCHELL is the brother of, and current methamphetamine supplier to, JOHN MITCHELL and EUGENE MITCHELL. This location is

DERRICK MITCHELL'S primary residence and appears to be the place where DERRICK

MITCHELL most likely stores his drugs, drug money, and drug-related business records. There

is minimal traffic coming and going from the residence, which is consistent with a "stash"

location. Knoxville Utility Board (KUB) records indicate that "Derrick K. Mitchell" turned on

power at the residence on June 19, 2020, and has no other active power service in the KUB

coverage area. On August 24, 2020, search warrants for continued monitoring of the covert

camera system located at Tewksbury Drive were authorized by this Court. This camera system is

currently active.

      45.     On August 8, 2020, court-authorized geolocation data for TARGET PHONE # 1

utilized by TATE, indicated that the phone left Knoxville at 2:41 p.m. (all referenced times are

approximate) and arrived in east Atlanta at 5:31 p.m. At 5:47 p.m., TARGET PHONE # 1

arrived in the Gresham Park area of Atlanta (west of Conyers, Georgia) off Interstate 20. At

6:17 p.m., geolocation data indicated that TARGET PHONE # 1 had left the area and returned to

east Atlanta. At 6:48 p.m., TARGET PHONE # 1 had left the area and was north of Atlanta on

Interstate 75. At 9:22 p.m., TARGET PHONE # 1 arrived back in Knoxville. Based upon my

training, knowledge, and experience, I believe that TATE traveled to Gresham Park area of

Atlanta, Georgia on this date to obtain a supply of methamphetamine. Normal citizens don't

generally travel that distance to only stay for approximately 45 minutes.

      46.     On August 18, 2020, agents utilized CS-11632 to make a controlled purchase of

suspected heroin from TATE. Prior to the transaction, CS-11632 mentioned that TATE would

likely have him/her meet at a storage building sales lot location off Western Avenue. I asked

CS-11632 if he/she was referring to RR Buildings. CS-11632 indicated that there is an auto

detail shop behind RR Buildings and a black male by the name of "Rayvon" owns the detail

shop. CS-11632 said that "Rayvon" is a heroin distributor and that he/she has purchased heroin from "Rayvon" on many occasions. CS-11632 said that TATE and "Rayvon" are friends and TATE frequently conducts narcotics transactions in the parking lot of the shop. Later that day, CS-11632 met with TATE at the Gulf Gas Station on Western Avenue in Knoxville. TATE was parked at the gas pumps in a white Chevy Malibu with Massachusetts tag # 7RF-582. CS-11632 approached the vehicle and met with TATE at the driver's side front door. TATE weighed out approximately 1 gram of suspected heroin and provided it to CS-11632. CS-11632 paid TATE $180 of TBI confidential funds. This transaction was monitored via audio/video live feed and was audio/video recorded, and I have reviewed the recording.

47.     On August 18, 2020, with the aid of the court-authorized covert camera system installed at or near Oakland Drive, I observed a silver Mazda Sedan with Tennessee tag # DP53118 arrive at Oakland Drive at approximately 3:42 p.m. A female subject exited the vehicle and walked up the driveway to the residence. Approximately one minute later, the female subject returned to the driver's seat of the vehicle. Approximately one minute later, a black male subject believed to be EUGENE MITCHELL walked down the driveway of the residence and entered the rear seat of the vehicle. A short time later the vehicle left the residence and turned south on Oakland Drive. With the aid of the covert camera system installed at or near Tewksbury Drive, the same vehicle observed at Oakland Drive arrived at Tewksbury Drive at approximately 4:16 p.m. EUGENE MITCHELL exited the vehicle and walked to the front door. DERRICK MITCHELL answered the door and allowed EUGENE MITCHELL to enter the residence. At approximately 4:20 p.m., EUGENE MITCHELL exited the residence and returned to the rear seat of the vehicle. The vehicle left the residence at approximately 4:20 p.m. This activity is consistent with the drug transaction with EUGENE MITCHELL on July 30, 2020

described herein in which EUGENE MITCHELL took CS-11632 to Tewksbury Drive to obtain methamphetamine from DERRICK MITCHELL.

48.     On September 4, 2020, agents caused a covert camera system to be installed at or near 7705 Tillett Lane, Knoxville, Tennessee (Tillett Lane), the current residence of TAWANA CORTEZ. Since installation, Agents have seen a higher than normal volume of vehicular traffic at the residence. Many of the visitors to Tillett Road stay for brief periods of time and return to Tillett Road, multiple times a day. This is highly consistent with narcotics trafficking, based upon my knowledge training and experience. Furthermore, Agent have observed vehicles coming and going from the residence that are registered to/ or associated with customers and co-conspirators that DOUGLAS identified in his interview. Particularly, a unique pickup truck registered to BILLADO (TN Tag # 2J8-8E6) is seen coming and going from Tillett Lane on a regular basis, as is a dark colored Volvo sedan with a white side mirror known to be utilized by DOUGLAS' girlfriend, TAYLOR. Agents have also observed motorcycles coming and going from the residence. The covert camera system has confirmed many aspects of DOUGLAS' interview. This camera system is currently active.

49.     On September 15, 2020, agents utilized CS-11632 to make a controlled purchase of ice methamphetamine from EUGENE MITCHELL. CS-11632 met with EUGENE MITCHELL at Oakland Drive. EUGENE MITCHELL entered CS-11632's vehicle and they traveled to the area of Minnesota Avenue in Knoxville, Tennessee (in the Lonsdale community). EUGENE MITCHELL was talking on his cellular telephone and said, "I'll be by there in ten minutes, bro." Five minutes prior to this telephone call, via the covert camera system, Agents observed DERRICK MITCHELL leave Tewksbury Drive in a black Nissan Altima. After the call, EUGENE MITCHELL said, "Lonsdale, J-Money," referring to a location that his brother

DERRICK MITCHELL frequents. While traveling, CS-11632 provided EUGENE MITCHELL $750 in TBI confidential funds. CS-11632 dropped EUGENE MITCHELL off behind 1955 Pascal Drive and EUGENE MITCHELL instructed CS-11632 to pull around to the other side of the building. EUGENE MITCHELL walked to an unknown location. A short time later, EUGENE MITCHELL got back in the vehicle. CS-11632 and EUGENE MITCHELL later traveled to 4017 Oakland Drive, Knoxville, Tennessee, where CS-11632 and EUGENE MITCHELL entered his bedroom. EUGENE MITCHELL weighed out the methamphetamine on a set of digital scales he had in his room and then provided CS-11632 with approximately 32 grams of suspected ice methamphetamine.

50. On September 16, 2020, agents utilized CS-11632 to make a controlled purchase of suspected heroin from TATE. Later that day, CS-11632 met with TATE at the Rite Stop Food Market and Deli on Dutch Valley Road in Knoxville. A gray Nissan Altima that CS-11632 recognized to TATE was parked at the gas pumps. CS-11632 parked and walked over to the passenger-side front door of the vehicle and entered the vehicle. A black male known to CS-11632 as "Big Mike" and "Six" was in the driver's seat, and an unknown black male subject was in the back seat. When CS-11632 entered the vehicle, he/she noticed that there were plastic baggies of Methamphetamine and Heroin in the front-passenger door handle compartment. CS-11632 discovered that TATE had entered the store and exited the vehicle to make contact with TATE. CS-11632 made contact with TATE at the store door and walked back to the passenger side of TATE'S vehicle. TATE opened the door and stood in the door jamb. CS-11632 paid TATE $180 in TBI confidential funds and TATE handed CS-11632 a plastic baggy containing approximately 1.1 grams of suspected heroin. This transaction was monitored via audio/video live feed and was audio/video recorded, and I have reviewed the recording. As noted above, there

was heroin and methamphetamine in the passenger side front-passenger door handle compartment, where TATE was sitting. CS-11632 quickly exited the vehicle when he/she realized that they were not supposed to be there with the stash of narcotics. CS-11632 is not in a position to purchase methamphetamine from TATE because TATE knows that CS-11632 has for the last three years, purchased user amounts of heroin. Variance from the normal often causes suspicion in drug trafficking.

51.     On September 17, 2020, agents utilized CS-11632 to make a controlled purchase of ice methamphetamine from JOHN MITCHELL. Prior to the transaction, CS-11632 stated that, while setting up the transaction with JOHN MITCHELL on the phone, he had told CS-1632 that TAWANA CORTEZ was also coming to pick up Methamphetamine and would be coming about the same time as CS-11632 to Oakland Drive. At approximately 5:58 p.m., via covert camera system installed in the vicinity of Tillet Lane (residence of TAWANA CORTEZ), agents observed a blue Jeep Liberty leave the residence (Tennessee tag #2V5-9X1). The driver of the vehicle appeared to be a female who was wearing a pink shirt. At approximately 6:50 p.m., via covert camera system installed in the vicinity of Oakland Drive, Agents observed a blue Jeep Liberty arrive at the residence. Agents were familiar with this vehicle and knew it to be utilized by TAWANA CORTEZ. At approximately 6:53 p.m., a surveillance team member drove by the residence and obtained the tag number displayed on the blue Jeep Liberty (Tennessee tag #2V5-9X1) JOHN MITCHELL and his girlfriend JENNIFER DANIELLE JOHNSON walked down the driveway of Oakland Drive and met with TAWANA CORTEZ' vehicle at the driver-side door. JOHN MITCHELL called CS-11632 to ask where he/she was at. At approximately 6:54 p.m., CS-11632 arrived at Oakland Drive and parked behind the blue Jeep Liberty along the roadway in front of the residence. A short time later, JOHN MITCHELL, JENNIFER

JOHNSON, and CS-11632 left the residence in a vehicle together. The surveillance team followed. The blue Jeep Liberty left the residence behind JOHN MITCHELL but, due to the size of the surveillance team, the blue Jeep Liberty was not followed. CS-11632 provided JOHN MITCHELL $700 in TBI confidential funds with prerecorded serial numbers. JOHN MITCHELL stopped at Woods-Smith Road Market and Deli located at 2240 Woods-Smith Road, Knoxville, Tennessee. JOHN MITCHELL, CS-11632 and JOHNSON had the following conversation upon arrival:

JOHNSON: You ready? Ready? We got to get out (JOHNSON exited the vehicle)
CS-11632: Oh, we've got to get out?
JOHN MITCHELL: Yeah, cause Derrick ... nobody goes to Derrick's house.
JOHN MITCHELL: Have you ever been to Derrick's house?
CS-11632: Uhm...
JOHNSON: You have?
JOHN MITCHELL: With Pug? And he didn't say nothing?
CS-11632: Nope. I didn't know I had to get out. God damn, dude's gonna trip.
JOHN MITCHELL: I'm going there and then I'm coming back ... I mean he just lives right there.
CS-11632: I know where he lives.
JOHN MITCHELL: (inaudible) and I'll be right back. You ain't gonna be here five minutes.

     52.     Thereafter, CS-11632 exited the vehicle and joined JOHNSON on the sidewalk in front of the business. At approximately 7:26 p.m., JOHN MITCHELL left the store parking lot. At approximately 7:27 p.m., via covert camera system installed at Tewksbury Drive (the residence of DERRICK MITCHELL), agents observed JOHN MITCHELL arrive at the residence and park in the driveway. JOHN MITCHELL went to the front door of the residence and knocked at the door. JOHN MITCHELL entered the front door at approximately 7:28 p.m. At approximately 7:32 pm, JOHN MITCHELL exited the front door of the residence. DERRICK MITCHELL came out with JOHN MITCHELL to the door and stood in the door

threshold while JOHN MITCHELL returned to his vehicle. At approximately 7:32 p.m., JOHN

MITCHELL entered his vehicle and left the residence. DERRICK MITCHELL closed the door

on the residence and remained inside.

53.     While JOHN MITCHELL went to Tewksbury Drive, CS-11632 and JOHNSON

had a conversation about coming to DERRICK MITCHELL's residence. JOHNSON stated that,

at nighttime, she would duck down in the floorboard of the vehicle so that DERRICK

MITCHELL would not know that she was in the vehicle. JOHNSON stated that, if the trip was

during the daytime, JOHN MITCHELL would require her to get out at the store prior to arrival.

JOHNSON said that she did not know why DERRICK MITCHELL did not want her coming

because she knows where he lives. CS-11632 indicated that he/she also knew where DERRICK

MITCHELL lives. JOHNSON mentioned that employees at the store likely knew they were

"drug addicts" because she got dropped off at the store every day about five times a day for this

purpose. At approximately 7:34 p.m., JOHN MITCHELL arrived back at Woods-Smith Road

Market and Deli. CS-11632 and JOHNSON entered the vehicle. As soon as CS-11632 entered

the rear seat, JOHN MITCHELL handed CS-11632 a plastic baggy containing approximately

32.7 grams of suspected ice methamphetamine. JOHN MITCHELL, JOHNSON, and CS-11632

arrived back at Oakland Drive at approximately 7:53 p.m.

54.     While at Oakland Drive, JOHN MITCHELL asked JOHNSON to get his scales

from the residence and she returned to the vehicle a short time later with the digital scales. CS-

11632 weighed the ice methamphetamine in the vehicle with the scales. CS-11632 said, "Oh,

yeah, I need that. I still need the scales … what's it supposed to weigh? This weighs thirty-two."

JOHN MITCHELL replied, "Twenty-eight." CS-11632 said, "God damn, well he done us really

good." A short time later, JOHN MITCHELL said, "This dope, the dope that was on my lap, I

don't know where it's at, I've got to take this over and give it." At approximately 7:59 p.m., CS-11632 returned to his/her vehicle. At approximately 8:00 p.m., via covert camera system installed at Oakland Drive, Agents observed a blue Jeep Liberty arrive at the residence and park along the roadway in front of the residence. SA Thompson recognized the vehicle as CORTEZ' vehicle. At approximately 8:01 p.m., CS-11632 announced that CORTEZ had arrived back at the residence. At approximately 8:01 p.m., JOHN MITCHELL walked to the driver's door of the blue Jeep Liberty and conducted a hand-to-hand exchange of two items with the driver who was wearing a pink shirt. At approximately 8:04 p.m., the blue Jeep Liberty left Oakland Drive traveling towards Tazewell Pike. A surveillance team began to follow the blue Jeep Liberty. The blue Jeep Liberty traveled to the Weigel's gas station located at 7420 Tazewell Pike, Corryton, Tennessee. The blue Jeep Liberty parked in the lower parking lot near the intersection of Tazewell Pike and East Emory Road. The blue Jeep Liberty remained in the parking lot for approximately thirty minutes and then traveled straight to SMITH'S residence at 7908 Corryton Road, Corryton, Tennessee (Corryton Road) The blue Jeep Liberty stayed at Corryton Road for approximately thirty minutes. As the driver of the vehicle returned to the vehicle in the driveway, a surveillance team member drove by the residence and identified the driver of the vehicle as CORTEZ. She was wearing a pink t-shirt. CORTEZ left Corryton Road and turned on Tillet Lane. At approximately 9:34 p.m., via the covert camera system installed at Tillet Lane, Agents observed CORTEZ turn into the upper driveway of her residence.

55.    Based upon my training, knowledge, and experience concerning the foregoing activities, I believe that JOHN MITCHELL purchased an unspecified amount of methamphetamine for TAWANA CORTEZ and one ounce of methamphetamine for CS-11632 from DERRICK MITCHELL at his residence on Tewksbury Drive. After conducting the

transaction with CS-11632, JOHN MITCHELL met TAWANA CORTEZ and conducted the exchange of two items in front of the residence at the driver's door, which I believe was bulk ice methamphetamine. TAWANA CORTEZ then drove to the Weigel's gas station where I believe she separated the methamphetamine into smaller baggies for resale. (As a general practice, drug traffickers who are buying in bulk will have to repackage the drugs into smaller packages to resell the product.) Then TAWANA CORTEZ traveled to Corryton Road where she delivered part of methamphetamine to SMITH returning to her residence on Tillett Lane where she stores her ice methamphetamine supplies.

56.     On September 22, 2020, CS-11632 was at Oakland Road sitting in a vehicle in front of the residence attempting to contact either JOHN MITCHELL or EUGENE MITCHELL by telephone to arrange a controlled purchase for later in the day. JOHN MITCHELL came outside the residence and instructed to CS-11632 to leave. CS-11632 called agents and advised what had happened. CS-11632 stated that it was highly unusual JOHN MITCHELL run someone off considering the normal high traffic at the residence. CS-11632 also stated that TATE was at the residence and was parked across the street from the residence conducting drug transactions. CS-11632 stated that TATE called via telephone and told CS-11632 that he had heroin available for purchase. With the aid of the court-authorized covert camera system installed at or near Oakland Drive, I confirmed that TATE's vehicle was parked across the street from Oakland Drive. Shortly after CS-11632 left the residence, I observed a black four-door sedan arrive at Oakland Drive and park in the driveway. JOHN MITCHELL immediately walked down the driveway and got into the passenger side front seat of the vehicle. JOHN MITCHELL remained in the vehicle for approximately two minutes and then exited the vehicle. The driver of the vehicle also exited the vehicle and I recognized the driver as DERRICK MITCHELL.  JOHN

MITCHELL and DERRICK MITCHELL entered the residence together. Approximately six minutes later, DERRICK MITCHELL left the residence in the dark sedan. Approximately 18 minutes later, with the aid of the covert camera system installed at or near Tewksbury Drive, I observed DERRICK MITCHELL's black Nissan Altima arrive at the residence and pull into the garage.

57.    Concerning the foregoing events, based upon my training, knowledge, and experience, I believe that the reason that JOHN MITCHELL ran CS-11632 off from the residence was because his supplier was about to arrive to deliver ice methamphetamine and JOHN MITCHELL did not want him to become uncomfortable with unnecessary people hanging around the residence. I believe that DERRICK MITCHELL met JOHN MITCHELL to deliver ice methamphetamine in much the same way that TATE has delivered to the residence in the past. Furthermore, TATE was seen at Oakland Drive by CS-11632 conducting transactions, which was confirmed by video surveillance.

58.    On September 22, 2020, agents utilized CS-11632 to make a controlled purchase of suspected heroin from TATE.  Later that day, CS-11632 met with TATE in an alleyway behind a residence on Atlantic Avenue Knoxville, Tennessee.  CS-11632 met TATE at the driver's door of his vehicle.  CS-11632 paid TATE $180 in TBI confidential funds and TATE handed CS-11632 a plastic baggy containing approximately one gram of suspected heroin.  This transaction was monitored via audio/video live feed and was audio/video recorded, and I have reviewed the recording.  From review of surveillance footage from the covert camera system installed in the vicinity of Meadowview Way, TATE left Meadowview Way that morning at approximately 9:14 a.m. in the same vehicle that he met CS-11632 later that evening to conduct

the transaction and the same vehicle that he was conducting transactions in at Oakland Drive as described in the previous paragraphs.

59.     On September 23, 2020, agents utilized a reliable, 4th Judicial District Drug Task Force (4th DTF) confidential source (hereafter referred to as the "4th DTF CS") to make a controlled purchase of ice methamphetamine from SMITH at his residence located at 7908 Corryton Road, Corryton Tennessee (Corryton Road). Prior to the transaction, the 4th DTF CS stated that he/she had been purchasing ice methamphetamine from SMITH for approximately 6 months and was introduced to SMITH by CS-11559. The 4th DTF CS has conducted at least 10 controlled purchases of illegal narcotics on behalf of the 4th DTF/FBI HIDTA Task Force, which has resulted in the seizure of illegal narcotics, the pending arrest of at least five defendants, and the execution of at least one search warrant which resulted in the seizure of ice methamphetamine and firearms. The 4th DTF CS's information has been corroborated by other reliable confidential sources, controlled purchases, a search warrant, and defendant interviews. The 4th DTF CS's information has been proven to be accurate and reliable. The 4th DTF CS has been implicated in this investigation and seeks leniency. Additionally, agents have paid the 4th DTF CS to help cover some of his/her cooperation-related expenses. The 4th DTF CS's criminal history includes multiple DUI offenses, drug paraphernalia charges, multiple drug charges, and domestic assault. However, extra control measures where utilized with the 4th DTF CS, including live audio/video feeds to confirm the veracity of 4th DTF CS information regarding this investigation.

60.     The 4th DTF CS had prearranged the transaction with SMITH, prior to arrival to prepare for the transaction. The 4th DTF CS and an undercover narcotics agent got into a vehicle together and traveled to Corryton Road. Upon arrival, the 4th DTF CS exited the vehicle and met

with SMITH in an outbuilding located in the front yard of the residence. The 4th DTF CS purchased approximately 3.6 grams of suspected ice methamphetamine from SMITH for $180. SMITH asked the 4th DTF CS if they wanted additional ice methamphetamine. The 4th DTF CS consulted with the undercover narcotics agent, then went back inside the outbuilding and agreed to buy the additional ice methamphetamine from SMITH. The 4th DTF CS advised SMITH that he/she needed to go get additional money to make the purchase. The 4th DTF CS and the undercover narcotics agent left the residence and returned to a meeting spot. Later, the 4th DTF CS and the undercover narcotics agent returned to Corryton Road where the 4th DTF CS again entered an outbuilding located in the front yard of the residence. The 4th DTF CS purchased approximately 3.6 grams of suspected ice methamphetamine from SMITH for $150. The total amount of ice methamphetamine purchased from SMITH during these two transactions was approximately 7.2 grams. This transaction was monitored via audio/video live feed and was audio/video recorded, and I have reviewed the recording.

61.     On September 28, 2020, agents utilized the 4th DTF CS to make to make a controlled purchase of ice methamphetamine from SMITH at his residence, Corryton Road. The 4th DTF CS had prearranged the transaction with SMITH, prior to arrival to prepare for the transaction. The 4th DTF CS and an undercover narcotics agent got into a vehicle together and traveled to Corryton Road. Upon arrival, the 4th DTF CS exited the vehicle and met with SMITH in an outbuilding located in the front yard of the residence. The 4th DTF CS purchased approximately 3.5 grams of suspected ice methamphetamine from SMITH for $180. During the transaction SMITH told the 4th DTF CS that what they had bought was "the bottom of the bag." SMITH said that he anticipated being re-supplied later in the night or early the next morning.

SMITH said the supplier had not called him yet, but that he expected the supplier to be there the next morning.

62. On October 2, 2020, I learned that CS-11632 passed away. I was aware that CS-11632 had been dealing with medical problems for some time, although I have not learned of the precise cause of his/her death. There is nothing to suggest that foul play was involved.

63. All of CS-11632's controlled purchases were audio- and video-recorded, and I have reviewed all of them. Each recording clearly depicts the person from whom the drugs were purchased, leaving no need for CS-11632 to interpret the recordings. Thus, the evidentiary value of those controlled purchases remains high despite CS-11632's death.

64. In the subsequent paragraphs, I will attempt to summarize the probable cause to search each of the requested locations based on the specific information described previously herein and the other affidavits filed in this investigation, all of which are fully incorporated herein.

### 4017 Oakland Drive Knoxville, Tennessee (Oakland Drive)

65. This is the primary residence of JOHN MITCHELL and EUGENE MITCHELL. This location is a distribution hub for customers to obtain their narcotics, particularly ice methamphetamine. The investigation has revealed that JOHN MITCHELL, EUGENE MITCHELL, TATE, and now DERRICK MITCHELL distribute ice methamphetamine from the residence and have done so consistently for many months.

66. Between June 17, 2020 and September 17, 2020, CS-11632 purchased a total of approximately 94 grams of ice methamphetamine from EUGENE MITCHELL over six transactions and a total of approximately 108 grams of ice methamphetamine from JOHN MITCHELL over five transactions. Many of the transactions originated at Oakland Drive and

terminate at Oakland Drive. During the course of several of the transactions with both EUGENE MITCHELL and JOHN MITCHELL, they took the ice methamphetamine into Oakland Drive to be separated and/or weighed. Both EUGENE MITCHELL and JOHN MITCHELL have had ice methamphetamine on them when CS-11632 arrived at the residence to make a purchase. Traffic stops have been conducted of vehicles leaving the residence, which has resulted in the seizure of ice methamphetamine and a firearm.

67.     As described herein, CS-11632 was present at Oakland Drive as recently as September 22, 2020, when activities consistent with drug resupplying were taking place.

68.     Generally speaking, agents have observed an extremely high volume of vehicular traffic at Oakland Drive throughout the investigation via the covert camera system. This has not changed through the present date. Frequently, the driveway will not accommodate parking for the high volume of vehicular traffic present at Oakland Drive, and visitors will park either in the roadway or across the street in a church parking lot entrance. Many of the visitors to Oakland Drive stay for brief periods of time and return to Oakland Drive multiple times a day. This is highly consistent with narcotics trafficking, based upon my knowledge, training, and experience. Oakland Drive is not a temporary drug trafficking location subject to being abandoned at a moment's notice. It is the base of operations for two entrenched drug traffickers, EUGENE MITCHELL and JOHN MITCHELL, and their primary residence. It is also used as a distribution location for another entrenched drug trafficker, TATE. Despite the challenges occasioned by the COVID-19 pandemic, all of these co-conspirators have managed to maintain methamphetamine supplies and have consistently distributed those supplies from Oakland Drive for months on end. Based on my review of the camera footage from Oakland Drive in recent

days, there is every reason to believe that the drug trafficking activities there have continued unabated since September 17, 2020.

69. A recent controlled purchase of one ounce of ice methamphetamine was conducted with JOHN MITCHELL on September 17, 2020, which began and ended at Oakland Drive. After the transaction with CS-11632, JOHN MITCHELL distributed an unspecified amount of ice methamphetamine to another customer, TAWANA CORTEZ in the roadway, in front of the residence. On September 22, 2020, DERRICK MITCHELL likely made a delivery of ice methamphetamine to JOHN MITCHELL. TATE was conducting transactions in the roadway in front of the residence as witnessed by CS-11632 and confirmed by video surveillance.

**1906 Meadowview Way, Knoxville, Tennessee**

70. This is the primary residence of TATE and his girlfriend, JEANESHA CHANDLER. Lenoir City Utility Board (LCUB) records indicate that "Jeanesha Chandler" had power turned on at the residence on May 4, 2020 and has no other active power service in the LCUB or KUB coverage area.

71. The investigation has revealed that TATE routinely uses different vehicles, often rental cars, to avoid law enforcement detection and identification. JEANESHA CHANDLER has rented every one of the vehicles identified by agents, and TATE has used all of them to distribute narcotics. Thus, there is probable cause to believe CHANDLER is participating in this conspiracy. TATE utilizes counter surveillance measures to prevent law enforcement detection and identification of TATE'S primary residence.

72. Narcotic traffickers generally carry small amounts of narcotics in their vehicle to meet their customers demand and maintain a stash of narcotics in a more secure location. For TATE, I believe that his primary residence at Meadowview Way is that location. TATE has been

careful to not be followed to Meadowview Way, drives vehicles in his girlfriend's name (which would not seem out of place at her residence), and stays in a residence listed in CHANDLER's name. TATE also tints the windows of the rental cars he uses in a attempt to prevent law enforcement from noticing that he drive the cars rented by CHANDLER. All of this strongly suggests that he uses CHANDLER to superficially insulate himself from his illegal activities. It would make sense, then, for him to keep his stash of drugs at a residence listed in CHANDLER's name.

73.     Between January 10, 2020 and February 7, 2020, agents utilized CS-11559 to conduct seven controlled purchases of ice methamphetamine from TATE, ranging from four ounces (1/4 pound) to two ounces in weight. Agents have seized approximately 669 grams of ice methamphetamine from TATE to date, through controlled purchases, all within the Eastern District of Tennessee. (A typical dosage unit of ice methamphetamine is one to two-tenths of a gram). All the transactions have been monitored live via audio/video feed and were video recorded.

74.     During the early stages of this investigation, TATE was the primary source of ice methamphetamine to JOHN MITCHELL and EUGENE MITCHELL. TATE has assumed the role of secondary source of supply. DERRICK MITCHELL assumed the role of primary source during the summer of 2020, due to TATE'S difficulty obtaining quality ice methamphetamine. Conversation suggests that in late July 2020, TATE was still supplying JOHN MITCHELL with methamphetamine, but the quality of the methamphetamine was poor at the time. Throughout this investigation, TATE has consistently had crack cocaine and heroin available for purchase, however, agents have focused on methamphetamine.

75.     CS-11632 has made several (user quantity) purchases of heroin from TATE beginning in August 18, 2020 and as recently as September 22, 2020.  From review of September 22, 2020, surveillance footage from the covert camera system installed in the vicinity of Meadowview Way, TATE left Meadowview Way that morning at approximately 9:14 a.m., in the same vehicle that he met CS-11632 later that evening to conduct the transaction and the same vehicle that he was conducting transactions in at Oakland Drive.

76.     During a July 27, 2020, surveillance of TATE at Meadowview Way, TATE began searching a black backpack that he retrieved from inside his vehicle.  TATE appeared nervous and was looking around the neighborhood, while searching the backpack.  TATE appeared to put the backpack in the rear seat and then lay across the front seats upside down searching the floorboards.  Based upon my training, knowledge, and experience, I believe that TATE likely misplaced narcotics and/or US currency and was searching his vehicle and backpack for the lost items. I have since observed TATE carry a similar backpack out of Meadowview Way on several occasions and place it in his vehicle prior to leaving for the day. Further surveillance on this same day demonstrated that TATE was able to conduct multiple apparent narcotics transactions without stopping at an alternate storage location, which further suggests that Meadowview Way is his stash location.

77.     As recently as September 16, 2020, CS-11632 has seen TATE in possession of both ice methamphetamine and heroin during a transaction with CS-11632. Furthermore, monitoring of real-time geolocation information has revealed that TARGET TELEPHONE # 1 is normally in the vicinity of Meadowview Way during the late-night hours to morning and this is the telephone that TATE utilized to arrange and conduct transactions. This telephone will likely have an extremely large amount of telephone calls and text messages related to drug trafficking

contained inside of it. TARGET TELEPHONE # 1 has been utilized to arrange and conducted each methamphetamine and heroin transactions with TATE thus far.

78.     Monitoring of real-time geolocation information has revealed that TARGET TELEPHONE # 1 moves around Knoxville in a fairly constant pattern and stops in the vicinity of at known drug distribution locations, to include 3313 Bishop Street, 2204 McCalla Avenue, 3511 Greenway Drive, 3143 Johnston Street, and Oakland Drive, often, multiple times a day. The drug trafficking activities at these residences has been confirmed by physical surveillance over the course of this investigation.

79.     Generally speaking, Agents have observed an extremely low volume of vehicular traffic at Meadowview Way via the camera system throughout this investigation. TATE has consistently stayed at Meadowview Way overnight and has been seen taking the trash to the curb on multiple occasions. Generally, with only a few of exceptions, no other people are observed there except the occasional delivery service driver. TATE will generally leave Meadowview Way in the morning and then return around midnight or later. Based upon my training, knowledge, and experience, I believe that TATE wants to keep Meadowview Way discrete because he stores narcotics, narcotics proceeds, and drug trafficking records there. Exposure to drug customers dramatically increases the likelihood of law enforcement detection (i.e., like Oakland Drive).

### 6436 Tewksbury Drive Knoxville, Tennessee

80.     This is the primary residence of DERRICK MITCHELL, who is JOHN MITCHELL and EUGENE MITCHELL's primary ice methamphetamine source of supply. Agents discovered this residence on July 30, 2020, during a purchase of one ounce of ice methamphetamine from EUGENE MITCHELL. During the transaction, EUGENE MITCHELL

took CS-11632 to the residence, took money from CS-11632, and entered the residence. CS-11632 saw DERRICK MITCHELL look out the window when they arrived at the residence.[3] EUGENE MITCHELL stayed in the residence for a short time and returned to the vehicle with approximately ½ ounce of ice methamphetamine. EUGENE MITCHELL retrieved an additional ½ ounce of methamphetamine that he had stashed in the vehicle. EUGENE MITCHELL mixed the two bags together and provided approximately one ounce of ice methamphetamine to CS-11632.

81.     On September 17, 2020, CS-11632 purchased one ounce of ice methamphetamine from JOHN MITCHELL. During the transaction, JOHN MITCHELL dropped of CS-11632 and JOHNSON at a store less than half a mile away from Tewksbury Drive. JOHN MITCHELL stated that he was going to obtain the methamphetamine from his brother, DERRICK MITCHELL. Approximately one minute after leaving the store, JOHN MITCHELL arrived at Tewksbury Drive, entered the residence and met with DERRICK MITCHELL. JOHN MITCHELL stayed in the residence briefly and then returned to the store to pick up CS-11632 and JOHNSON. JOHN MITCHELL immediately conducted the one-ounce ice methamphetamine transaction with CS-11632 upon getting into the vehicle and conducted another ice methamphetamine transaction with CORTEZ upon returning to Oakland Drive.

82.     While waiting for JOHN MITCHELL to return to the store, CS-11632 and JOHNSON discussed JOHN MITCHELL's trips to Tewksbury Drive to obtain methamphetamine. JOHNSON stated that, at nighttime, she would duck down in the floorboard of the vehicle so that DERRICK MITCHELL would not know that she was in the vehicle. JOHNSON stated that, if the trip was during the daytime, JOHN MITCHELL would require her

---

[3] DERRICK MITCHEL was not captured on video; EUGENE MITCHELL was captured on video.

to get out at the store prior to arrival. JOHNSON admitted that she was dropped off at the store about five times a day for this purpose. Based upon my training, knowledge, and experience, I believe that DERRICK MITCHELL does not want anyone but family to come to the residence because he stores narcotics and proceeds from narcotics sales at the residence. Exposure to customers, who might include confidential informants, dramatically increases the likelihood of law enforcement detection.

### 7908 Corryton Road Corryton, Tennessee

83. This is the primary residence of SMITH and is a distribution location for ice methamphetamine. On July 24, 2020, agents interviewed JOSHUA ADAM DOUGLAS, who in, great detail, described CORTEZ's DTO and identified SMITH as a customer of CORTEZ.

84. On September 17, 2020, agents utilized CS-11632 to make a controlled purchase of ice methamphetamine from JOHN MITCHELL. Prior to the transaction, CS-11632 stated that, while setting up the transaction with JOHN MITCHELL on the phone, he had told CS-1632 that CORTEZ was also coming to pick up methamphetamine and would be coming about the same time as CS-11632 to Oakland Drive. CORTEZ was at Oakland Drive meeting with JOHN MITCHELL when CS-11632 arrived. JOHN MITCHELL took CS-11632 and JOHNSON a store and dropped them off. EUGENE MITCHELL then traveled to Tewksbury Drive, entered the residence, and met with DERRICK MITCHELL. JOHN MITCHELL stayed in the residence briefly and then returned to the store to pick-up CS-11632 and JOHNSON. JOHN MITCHELL immediately conducted the one-ounce ice methamphetamine transaction with CS-11632 upon getting into the vehicle and then conducted another ice methamphetamine transaction with CORTEZ upon returning to Oakland Drive. A surveillance team followed CORTEZ from Oakland Drive to a gas station where CORTEZ set in the parking lot for approximately thirty

minutes and then traveled straight to SMITH'S residence at Corryton Road. CORTEZ stayed at Corryton Road for approximately thirty minutes. CORTEZ left Corryton Road and turned on Tillet Lane. Via covert camera system installed in the vicinity of Tillet Lane, Agents observed CORTEZ turn into the upper driveway of her residence.

85. Based upon my training, knowledge, and experience, I believe that JOHN MITCHELL purchased an unspecified amount of suspected methamphetamine for CORTEZ and one ounce of methamphetamine for CS-11632 from DERRICK MITCHELL at his residence at Tewksbury Drive. After conducting the transaction with CS-11632, JOHN MITCHELL met CORTEZ and conducted the exchange of two items in front of the residence at the driver's door, which I believe was bulk ice methamphetamine. CORTEZ then drove to the Weigel's gas station where I believe she separated the purchased methamphetamine from JOHN MITCHELL into smaller baggies for resale. As a general practice, drug traffickers who are buying in bulk will have to repackage the methamphetamine into smaller packages to resale the product. Then CORTEZ traveled to Corryton Road where she delivered part of methamphetamine to SMITH (who DOUGLAS identified as a customer in his statement), and then traveled back to her residence, Tillett Lane.

86. On September 23, 2020, agents utilized a reliable, the 4th DTF CS to make a controlled purchase of ice methamphetamine from SMITH at his Corryton Road residence. During two visits to Corryton Road with an undercover narcotics agent, the 4th DTF CS bought a total of 7.2 grams of ice methamphetamine from SMITH in an outbuilding located in the front yard of the residence. These transactions were monitored via audio/video live feed and was audio/video recorded, and I have reviewed the recordings.

87.     On September 28, 2020, agents utilized the 4th DTF CS to make to make another controlled purchase of ice methamphetamine from SMITH at Corryton Road. The 4th DTF CS had prearranged the transaction with SMITH, prior to arrival to prepare for the transaction. The 4th DTF CS and an undercover narcotics agent got into a vehicle together and traveled to Corryton Road. Upon arrival, the 4th DTF CS exited the vehicle and met with SMITH in an outbuilding located in the front yard of the residence. The 4th DTF CS purchased approximately 3.5 grams of suspected ice methamphetamine from SMITH for $180. During the transaction SMITH told the CI that what they had bought was "the bottom of the bag". SMITH said that he anticipated being re-supplied later in the night or early the next morning. SMITH said the supplier had not called him yet, but that he expected the supplier to be there the next morning.

88.     Based upon my training, knowledge, and experience, Corryton Road is SMITH'S primary residence where SMITH stores narcotics and proceeds of narcotics trafficking. Although he may have conducted the controlled transactions in an outbuilding, he most likely stores his drugs, money, and records inside his residence where it is more secure.

### 7705 Tillet Lane Corryton, Tennessee

89.     This is the primary residence of CORTEZ and is a distribution location for ice methamphetamine. On July 24, 2020, agents interviewed JOSHUA ADAM DOUGLAS, who in, great detail, described the activities that occur at Tillet Lane on a regular basis and the quantities of ice methamphetamine that CORTEZ was obtaining and distributing. DOUGLAS also detailed CORTEZ'S involvement with JOHN and EUGENE MITCHELL. DOUGLAS admitted that he was considered an enforcer and protector of Tillett Lane and that his primary role in the organization was to make sure that CORTEZ was not robbed, that order was maintained at Tillett Lane.

90.    I consider DOUGLAS's information to have been voluntarily given, and I believe it to be reliable because it is highly detailed and consistent with other information known to me based on my investigation of this DTO. Additionally, the information was against DOUGLAS's own penal interests in that he fully admitted his involvement in the DTO. As described herein, and many aspects of the statement, specific and general, have been corroborated by video surveillance at Tillett Lane and at Oakland Drive, and by further investigation.

91.    On July 28, 2020, during a controlled drug buy, JOHN MITCHELL received a telephone call from a female named "Tawana" who wanted to purchase one-and-a-half ounces of methamphetamine. I believe this to have been CORTEZ. JOHN MITCHELL instructed CORTEZ to come to Oakland Drive in about thirty minutes. Part of the conversation was on speakerphone and some was not. CS-11632 overheard the conversation while sitting beside JOHN MITCHELL in the vehicle. The resulting recording corroborated CS-11632's version of events. After the transaction, CS-11632 identified a photograph of CORTEZ as the person on the phone known to him/her as "Tawana." After completing the transaction, a surveillance team responded to Tillett Lane however, it is unknown whether the anticipated transaction between JOHN MITCHELL and CORTEZ occurred later that night or not at all.

92.    On August 21, 2020, CORTEZ and ELLISON where arrested in Knox County, Tennessee. Officers were dispatched to 7116 Maynardville Pike (Little Caesars) in reference to a suspicious person in the parking lot. Officers made contact with CORTEZ and ELLISON in a motor vehicle in which syringes were in plain view. ELLISON and CORTEZ were both found to be under the influence of alcohol and/or narcotics. A pat down search of ELLISON revealed a baggy containing approximately 14.52 grams of suspected ice methamphetamine in his left front pocket. An inventory of the blue Jeep Liberty, TN Tag 2U5-9X1 (the same Jeep discussed

previously herein) revealed a small baggy inside a Crown Royal bag under the driver's seat containing approximately 1.7 grams of suspected heroin. Both suspects denied ownership of the suspected heroin. Multiple needles were located throughout the vehicle. CORTEZ advised officers that they had "shot up" pain pills prior to the officer's arrival. This case is currently pending in Knox County Criminal court and the next court appearance is set for October 12, 2020.

93.     On September 17, 2020, agents utilized CS-11632 to make a controlled purchase of ice methamphetamine from JOHN MITCHELL. Prior to the transaction, CS-11632 stated that while setting up the transaction with JOHN MITCHELL on the phone, he had told CS-1632 that CORTEZ was also coming to pick up methamphetamine and would be coming about the same time as CS-11632 to Oakland Drive. CORTEZ was at Oakland Drive meeting with JOHN MITCHELL when CS-11632 arrived. JOHN MITCHELL took CS-11632 and JOHNSON a store and dropped them off. EUGENE MITCHELL then traveled to Tewksbury Drive, entered the residence and met with DERRICK MITCHELL. JOHN MITCHELL stayed in the residence briefly and then returned to the store to pick up CS-11632 and JOHNSON. JOHN MITCHELL immediately conducted the one-ounce ice methamphetamine transaction with CS-11632 upon getting into the vehicle and then conducted another ice methamphetamine transaction with CORTEZ upon returning to Oakland Drive. A surveillance team followed CORTEZ from Oakland Drive to a gas station where CORTEZ set in the parking lot for approximately thirty minutes and then travels straight to SMITH'S residence at Corryton Road. CORTEZ stayed at Corryton Road for approximately thirty minutes. CORTEZ left Corryton Road and turned on Tillet Lane. Via covert camera system installed in the vicinity of Tillet Lane, Agents observed CORTEZ turn into the upper driveway of her residence.

94.     Based upon my training, knowledge, and experience, I believe that JOHN MITCHELL purchased an unspecified amount of suspected methamphetamine for CORTEZ and one ounce of methamphetamine for CS-11632 from DERRICK MITCHELL at his residence at Tewksbury Drive. After conducting the transaction with CS-11632, JOHN MITCHELL met CORTEZ and conducted the exchange of two items in front of the residence at the driver's door, which I believe was bulk ice methamphetamine. CORTEZ then drove to the Weigel's gas station where I believe she separated the purchased methamphetamine from JOHN MITCHELL into smaller baggies for resale. Then CORTEZ traveled to Corryton Road where she delivered part of methamphetamine to SMITH (who DOUGLAS identified as a customer in his statement) and then traveled back to her residence, Tillett Lane, where she keeps her ice methamphetamine.

95.     Since installation of a camera system in the vicinity of Tillet Lane, Agents have observed a higher than normal volume of vehicular traffic at the residence. Many of the visitors to Tillett Lane stay for brief periods of time and return to Tillett Road, multiple times a day. Furthermore, Agent have observed vehicles coming and going from the residence that are registered to/or associated with customers/co-conspirators that DOUGLAS identified in his interview, particularly BILLADO and TAYLOR. Agents have also observed motorcycles coming and going from the residence, consistent with CORTEZ's involvement with supplying a motorcycle gang. Based upon my knowledge training and experience, I believe DOUGLAS statement is very accurate and has been corroborated by video surveillance and other investigation. I believe that ice methamphetamine is currently being distributed by CORTEZ and others at Tillet Lane, and that Tillet Lane will contain various evidence relating to drug trafficking, including drugs, money, and records.

96.     Based on the foregoing, there is probable cause to believe that the search of

Oakland Drive, Meadowview Way, Tewksbury Drive, Corryton Road, and Tillet Lane will lead

to the discovery of contraband, objects, documents, and things that will constitute "evidence of a

crime" and "property designed for use, intended for use, or used in committing a crime" within

the meaning of Rule 41(c) of the *Federal Rules of Criminal Procedure*.

97.     Specifically, based on the foregoing and based on the facts contained in my other

affidavits filed in this investigation, there is probable cause to believe that the following objects

or things will be found at each of the search locations:

Controlled substances, including methamphetamine; paraphernalia for packaging, cutting,
diluting, weighing, and distributing methamphetamine or other controlled substances (including,
but not limited to, scales, baggies, packaging materials, and powder cutting agents); telephone
records indicating telephone communications with coconspirators, drug customers and drug
suppliers; express or overnight mail receipts; U.S. Currency; bookkeeping records (to include,
receipts, schedules, tickets, notes, ledgers, and other documents relating to the transportation,
ordering, purchasing, and distribution of methamphetamine); address books; electronic and/or
digital records relating to drug trafficking stored or maintained on electronic devices (including
computers, iPads and other notepad devices, and smartphones) and/or electronic/digital media
(including computer discs and thumb drives); cellular telephones ~~(including the electronic and/or~~
~~digital content stored therein)~~ and pagers (beepers) utilized to facilitate the drug trafficking;
financial records (including bank statements and records, money drafts, letters of credit, money
orders and cashier's checks, passbooks, bank checks, wire transfer receipts and records, stocks,
bonds, vehicle titles, and keys to safe deposit boxes) which evidence the obtaining, transferring,
and concealment of the proceeds and assets associated with drug trafficking; photographs of drug
customers and suppliers and other coconspirators; photographs of assets acquired from the sale
of controlled substances; firearms and ammunition which are used to protect drugs and proceeds
from the sale of drugs; and mail, bills, and other documents which indicate dominion, ownership
or control of the residence and vehicles.

*MH?*
*10/05/20*

98.     Also based on the foregoing, there is probable cause to believe that all of the co-

conspirators named herein have violated 18 U.S.C. §§ 841(a)(1) and 846. However, due to local

housing limitations resulting from the COVID-19 pandemic, it is not possible to seek arrest

warrants for all culpable co-conspirators at this time. Nevertheless, there is probable cause to

believe that TATE, EUGENE MITCHELL, JOHN MITCHELL, DERRICK MITCHELL,

SMITH, and CORTEZ have violated the federal drug laws and should be subject to immediate arrest.

99.     For the reasons explained in my previous affidavits, this matter must remain sealed to protect integrity the investigation and the safety of the remaining confidential sources. As noted, it is not possible to seek arrest warrants for all culpable co-conspirators at this time. Thus, keeping this matter under seal for some period of time longer remains even more necessary than usual.

Respectfully submitted,

TFO

Matthew Thompson
Task Force Agent
FBI Rocky Top HIDTA Task Force


Subscribed and sworn to before me on October 5th, 2020

HON. DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE